IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| JOHN JOSHUA LAY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION 09-0075-WS-M |
| ) | |
| SCOTT D. HIXSON, *et al.*, ) | |
| ) | |
| Defendants. ) | |

**ORDER**

This matter came before the Court for non-jury trial on August 27, 2012. Both sides called witnesses and introduced exhibits into evidence. The record is now closed. Neither party having requested post-trial briefing, and none being necessary or appropriate in this case, the Court now enters findings of fact and conclusions of law, pursuant to Rule 52(a), Fed.R.Civ.P.

**I.      Nature of the Case.**

Plaintiff, John Joshua Lay, brought this salvage action under general maritime law against defendants, Scott D. Hixson and Gulf Bay Marine Construction, LLC ("Gulf Bay"). In particular, Lay alleges that he discovered a barge belonging to defendants floating adrift in August 2008, that he took reasonable steps to secure the barge and identify its owner, and that he is entitled to a salvage award of $12,250 (or 25% of the purported $49,000 value of the barge). For their part, defendants deny that Lay is entitled to any salvage award. Defendants' view is that the barge was not adrift, was not in maritime peril, and was not situated in such a manner that it could not be saved without Lay's assistance. These issues were the focal point of the trial.

**II.     Findings of Fact.**

Based on the evidence presented at trial, including both live testimony and exhibits admitted into evidence, the Court makes the following findings of fact by a preponderance of the evidence pursuant to Rule 52(a)(1), Fed.R.Civ.P.:

In August 2002, Hixson (who is the owner of Gulf Bay) purchased a pair of 8' x 40' work barges for the total sum of approximately $50,000. He intended for the barges to be used in Gulf Bay's business, which includes such activities as installing pilings and building piers and

marinas. Although the two barges were of the same length and width, they differed in that one had a mounted yellow crane, while the other did not. In the normal course of operations, the two barges were designed to be used together. To facilitate those joint operations, the barges could be secured together via an alignment pyramid mechanism (which enabled the barges to sit level in the water despite their differing weights and water displacements) and a series of attachment points (referred to in the testimony as "ear lobes") through which load binding ratchet straps with shackles and hooks could be fastened to bind the vessels together tightly.[1]

In late 2005, Hixson moved both barges to Long Bayou, which is part of the Wolf Bay watershed in Baldwin County, Alabama. Hixson intended to "store" the barges in the water until Gulf Bay needed them for another job (such as hurricane cleanup or a major construction project). He selected a moorage location on the edge of the creek, in shallow water at a depth of approximately 3½ feet.[2] The barge without the crane (the "Spudded Barge") was secured to that site via two "spuds," which are 21-foot long pipes weighing 400 to 500 pounds. Using the crane from the other barge, Hixson drove the spuds through cylindrical holes found at each end of the Spudded Barge, such the spuds passed all the way through the body of the barge, down through the water, and into the mud below to a depth of approximately 5 to 8 feet. The Spudded Barge was securely moored via this technique, and never budged from that location after Hixson secured it there.

As for the other barge (the "Crane Barge"), there were no spuds or other devices to anchor it separately into the mud in Long Bayou. However, at the time the Spudded Barge was secured to its moorage in Long Bayou, the Crane Barge was securely attached to the Spudded Barge through the alignment pyramid connectors, as well as the use of load binding ratchet straps at the "ear lobe" attachment points of the two barges. These binding straps – which were rated at 13,000 pounds for working loads – were tightly, securely and properly fastened in such a manner

---

[1] As Hixson explained in his trial testimony, a principal advantage to having these barges be separate 8' x 40' pieces, rather than a single 16' x 40' unitary whole, was that they could be separated and transported over land to remote job sites when necessary, rather than towing them via water the entire distance.

[2] According to Lt. Alex Smith of the Alabama Marine Police, it was in no way improper or unlawful for a private vessel owner such as Hixson to moor barges at the edge of the creek in Long Bayou. The Marine Police were well aware of the location and status of those barges for years after Hixson secured them there. There is no evidence that the Marine Police ever directed or requested that Hixson move those barges from that location at any time.

that the barges would not break loose from each other.  Also, the Crane Barge was positioned between the Spudded Barge and a grassy shoreline, with debris on one side of it that effectively created what Hixson termed a "forward obstruction to travel."  The net effect was that, as of late 2005, the Crane Barge was securely moored in Long Bayou, both by virtue of the load binding ratchets, ear lobes, and alignment pyramid hardware on the barges themselves and by virtue of the fact that it was wedged into a confined area in shallow water between the Spudded Barge and the edge of the creek, with a forward obstruction to movement, such that it was effectively pinned in on three sides.

Hixson did not utilize these barges in Gulf Bay's business for several years after placing them in Long Bayou.  But he did not abandon or ignore them, either.  From the time of the above-described moorage until the time of the Crane Barge's disappearance, Hixson and his friends and family members periodically checked on the two barges to verify that they remained securely moored and connected.  For example, on Thursday, August 21, 2008, Hixson's father, Douglas Hixson, took a boat out to Long Bayou and checked on the barges, at which time he observed them to be securely moored and tied together, just like always.  On that same date, Hixson's longtime friend Bancroft Marshall (a commercial pilot based in Orange Beach) flew over that area in an airplane and noticed nothing amiss in the appearance or location of the barges (which Marshall had helped Hixson secure at that location in 2005).  More importantly, the Alabama Marine Police Division regularly patrols Long Bayou.  Its patrol officers know the area (and defendants' barges) well.  Those officers consistently observed the barges to be securely moored at that location.  Upon careful consideration of the totality of the record, as well as the undersigned's observations of demeanor and credibility during the trial, the Court credits these witnesses' testimony.  On that basis, the Court makes a finding of fact that the Crane Barge was securely moored at Long Bayou as of August 24, 2008, and that it was not adrift in the creek at any time relevant hereto, much less for a period of weeks or even years as plaintiff contends.[3]

---

[3] In so concluding, the Court recognizes that the parties' testimony was sharply divergent on this point.  Lay testified that as of August 2008, the Crane Barge was simply adrift in the creek and that on different occasions he had observed it on different sides of the waterway.  Similarly, plaintiff's witness Lewis Hamilton testified that he had seen the Crane Barge adrift in that creek for a period of years, dating back to Hurricane Katrina.  The Court does not credit this testimony, but instead makes findings of fact that the Crane Barge was securely attached to the Spudded Barge and that both barges were secured in Long Bayou at all relevant times before Lay took the Crane Barge.

On August 24, 2008, Lay (with the assistance of Lewis Hamilton, who provided the necessary boat for towing purposes) moved the Crane Barge to a public boat ramp at Pirates Cove. Sometime between August 25 and August 27, Lay transported the Crane Barge to his home in Elberta, Alabama, where he left the barge in his front yard in an open and obvious condition, without concealing or hiding it in any manner.[4] During this same interval, Lay undertook various measures to identify and contact the owner of the Crane Barge, including placing a classified advertisement in the newspaper asking that the owner contact him and make salvage fee arrangements for return of the vessel. Lay's objective was never to convert the Crane Barge to his own long-term personal possession surreptitiously; rather, his plan at all times was to hold the Crane Barge on his property until he negotiated a salvage fee with its owner.

Unfortunately for Lay, his scheme to extract a hefty salvage fee from the barge's owner backfired badly. Within 24 hours after Lay moved the Crane Barge from its moorage at Long Bayou, Hixson learned of its disappearance and took to the skies (with the help of Marshall, his pilot friend) to locate the Crane Barge. Before dark on August 25, 2008, Hixson found the Crane Barge tied to the public boat ramp in Pirates Cove where Lay had left it. Hixson subsequently contacted the Alabama Marine Police to report the barge stolen, and ultimately filed a report of vessel theft to the Orange Beach Police Department on August 27.

On August 27, 2008, Lay received information that the Crane Barge belonged to Hixson. So Lay left a voice-mail message for Hixson that day demanding a $9,000 salvage fee for the return of the vessel. The next day, Lay and Hixson spoke for the first and only time, with Lay reiterating his $9,000 salvage demand. When Hixson indicated that he wanted the Crane Barge returned to the location from whence it had been taken, Lay responded that he would do so for an additional $3,000 fee. Hixson arranged to meet with Lay at a nearby gas station on the afternoon of August 28 to discuss the matter further. When Lay appeared at the appointed location, the Alabama Marine Police arrested him and took him into custody for stealing the Crane Barge.[5]

---

[4] Lay's then-housemate, Carl Poole, assisted Lay in removing the Crane Barge from the water by bringing a piling to the boat ramp. For his role in helping Lay, Poole later pled guilty in Baldwin County Circuit Court to the charge of aiding and abetting the theft of the barge.

[5] In November 2008, Lay was indicted in the Circuit Court of Baldwin County for theft of property in the first degree, in violation of Alabama Code § 13A-8-3. The ensuing criminal proceedings dragged on for more than three years. In January 2012, Baldwin County Circuit Judge Partin entered an Order of Restitution requiring Lay to pay restitution of $2,500 to (Continued)

The Marine Police located the Crane Barge in Lay's front yard and eventually restored possession of it to Hixson.

### III. Conclusions of Law.

As noted, Lay alleges a single cause of action against Hixson and Gulf Bay for salvage under the general maritime law; therefore, his claim must be evaluated by reference to traditional maritime principles. "In order to establish a claim for a salvage award, a potential salvor must demonstrate (1) the existence of a maritime peril from which the property could not have been saved without the salvor's assistance; (2) a voluntary act on the part of the salvor; and (3) the salvor's success in saving the property." *Cape Ann Towing v. M/Y "Universal Lady"*, 2008 WL 647095, *1 (11th Cir. Mar. 11, 2008); *see also Klein v. Unidentified Wrecked and Abandoned Sailing Vessel*, 758 F.2d 1511, 1515 (11th Cir. 1985) ("A claim for a salvage award requires that three elements be shown: (1) A maritime peril from which the ship or other property could not have been rescued without the salvor's assistance. (2) A voluntary act by the salvor – that is, he must be under no official or legal duty to render the assistance. (3) Success in saving, or in helping to save at least part of the property at risk."); *Esoteric, LLC v. One (1) 2000 Eighty-Five Foot Azimut Motor Yacht Named M/V STAR ONE*, 2012 WL 2105611, *1 (11th Cir. June 12, 2012) (reciting and applying *Klein* elements).

To prevail on his salvage claim, then, Lay must establish that the existence of maritime peril. *See Klein*, 758 F.2d at 1515 (affirming district court's denial of salvage award where "[p]laintiff's salvage efforts were directed toward a vessel that was not lost or suffering any marine peril"); *Fine v. Rockwood*, 895 F. Supp. 306, 309 (S.D. Fla. 1995) ("The existence of maritime peril is a necessary element for a valid salvage claim."). "Marine peril exists when the vessel is in a situation that might expose it to loss or destruction at the time the services are rendered." *New Bedford Marine Rescue, Inc. v. Cape Jeweler's Inc.*, 240 F. Supp.2d 101, 112 (D. Mass. 2003). To satisfy this standard, it must "be probable that the vessel will be damaged or destroyed without intervention." *United States v. Ex-USS CABOT/DEDALO*, 179 F. Supp.2d 697, 709 (S.D. Tex. 2000); *see also In re Complaint of The City of New York, as Owner and Operator of M/V ANDREW J. BARBERI*, 534 F. Supp.2d 370, 377 (E.D.N.Y. 2008)

---

Hixson, plus court costs of $1,297.50. In lieu of objecting and requesting a hearing on restitution, Lay elected to pay the restitution and court costs in full, after which the criminal charge was *nolle prossed* and the criminal proceedings came to an end.

("Reasonable apprehension of injury or destruction if the services are not rendered is the standard by which peril is adjudged to be present.") (citations omitted). "If there is not any danger, the services cannot be called marine salvage." *M/V ANDREW J. BARBERI*, 534 F. Supp.2d at 377; *see also Fine*, 895 F. Supp. at 309 ("If the vessel has the situation under control such that there is no reasonable apprehension for her safety in the future if left to her own unaided efforts, then there is an absence of peril.") (citations and internal quotation marks omitted).

The Court concludes that Lay has failed to meet his burden of proving that the Crane Barge was in maritime peril at the time of his intervention. The foregoing findings of fact are clear that the Crane Barge was not adrift in Long Bayou when Lay took possession of it and moved it to the public boat launch and then to his home. To the contrary, the Crane Barge was securely attached to the Spudded Barge, which in turn was securely moored to the creek bed. The Crane Barge was moored at the edge of the creek, positioned between the Spudded Barge and the shoreline in such a manner that it was insulated on three sides from boating traffic or other perils in the waterway. Simply put, at the moment when Lay took it upon himself to tow the vessel to Pirates Cove and then take it out of the water and transport it to his residence, the Crane Barge was in no danger (aside from any danger that Lay himself created for it in bad faith). It was not probable that the vessel would be damaged or destroyed in the absence of intervention by Lay. In fact, it had been parked in its present location without incident for nearly three years. Moreover, no reasonable person would have apprehended the Crane Barge to be at risk of injury or destruction in August 2008 if left to her own unaided efforts in Long Bayou. Plaintiff not having succeeded in establishing the existence of maritime peril, he is not entitled to a salvage award under general maritime law.[6]

---

[6] Although not essential to the conclusions of law set forth herein, it bears noting that the record is clear that Hixson neither requested nor desired that any salvage services be performed on the Crane Barge. Tellingly, when Lay contacted Hixson to negotiate a salvage fee, Hixson immediately told him that he wanted Lay to put the Crane Barge back where it had been. It is a fundamental principle of maritime law that a salvor generally cannot force rescue efforts on an unwilling vessel owner in order to exact a salvage award. *See International Aircraft Recovery, L.L.C. v. Unidentified, Wrecked and Abandoned Aircraft*, 218 F.3d 1255, 1262 (11th Cir. 2000) (construing law of salvage to "permit the owner of a vessel in marine peril to decline the assistance of others so long as only the owner's property interests are at stake," and relying on principle that "salvage cannot be exacted for assistance forced upon a ship") (citation omitted); *Klein*, 758 F.2d at 1515 (affirming district court's denial of salvage award where "the owner of the property may not even have desired for the property to be rescued"); *Fathom* (Continued)

**IV.     Conclusion.**

For all of the foregoing reasons, the Court finds that Lay "rescued" a vessel that did not require rescuing. The Crane Barge was not adrift, but was securely moored in the same location where it had been for approximately three years. It was not abandoned, because the vessel owner (and his family and friends) checked on it periodically to verify that it was safe and secure. The Alabama Marine Patrol was highly familiar with the barge, and consistently observed it to be secure and not to pose a danger to itself or anyone else. Having undertaken of his own accord to move the Crane Barge from its secure moorage to a public launch many miles away, and then to haul the Crane Barge to his home, plaintiff is ineligible for a salvage award. Simply put, the vessel did not require rescuing from marine peril, and no prudent owner would have wanted or authorized a putative salvor to intervene in those circumstances.

Accordingly, plaintiff shall have and recover nothing, and judgment will be entered in favor of defendants.

DONE and ORDERED this 29th day of August, 2012.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE

---

*Exploration, LLC v. Unidentified Shipwrecked Vessel or Vessels*, 352 F. Supp.2d 1218, 1229-30 (S.D. Ala. 2005) ("a salvor's right to salvage award may be impaired if the owner of the property does not desire such salvage"); *Jupiter Wreck, Inc. v. The Unidentified, Wrecked and Abandoned Sailing Vessel*, 691 F. Supp. 1377, 1389 (S.D. Fla. 1988) ("[P]otential salvors do not have any inherent right to save distressed vessels. Their activities must be subject to the owner's acquiescence."). This sort of improper compulsion appears to be exactly what Lay did, in seeking to force Hixson to pay for salvage activity that Hixson did not want and that the Crane Barge did not need.

To be clear, the Court is not imposing on salvors an absolute duty to ascertain a vessel owner's preferences before attempting to rescue a vessel from marine peril. Rather, the point is that where, as here, a prudent owner would not have accepted an offer of salvage, Lay was prohibited from taking advantage of the situation by furnishing unnecessary rescue services without the owner's permission, then extracting a salvage fee for same. *See, e.g., New Bedford*, 240 F. Supp.2d at 114 ("It is unnecessary for a salvor to get permission from an owner before commencing salvage services as long as a prudent man would have accepted the services."). This is particularly true given that Lay knew how to find and contact Hixson (as evidenced by the fact that he did so within 3 days after taking his barge). Rather than contacting Hixson upfront, Lay provided unwanted, unnecessary and expensive services that resulted in Hixson's Crane Barge being moved far from its moorage location, then demanded $9,000 from Hixson to return the vessel to him, with an additional $3,000 to put it back where he got it in the first place. A salvage award would be manifestly inappropriate in these circumstances.